May it please the court, Lewis Gordon, co-counsel for Quintero v. Gonzalez, I'd like to reserve two minutes for rebuttal. The court has directed that we be familiar with the facts in Ochoa versus Gonzalez, and there are essentially four points that I want to argue in this case. But I will go first to the distinction between the petitioner's case. And the facts in Ochoa v. Gonzalez. In Ochoa, the petitioner was a business owner who rejected demands to participate in an illegal act. The petitioner, in the case at hand, is a journalist who produced a anti-satanic cult documentary. We believe that the particular social group is much narrower in the petitioner's case. It does not comprise a major segment of the population as the merchant class did in Ochoa. The journalists are a narrow group. More importantly, the petitioner is part of an elite group of journalists. He was profiled in the... Is that a further refinement on your class? Why would that matter? Well, it narrows the class. So, okay, so the class is elite journalists? It could be elite journalists or prominent journalists, but he's a member of a very small social group. And that's precisely the difficulty. It seems to me that, you know, whether it's street children or journalists or whatever, you keep slicing it so thin that... How is it really a social class? Well, it's a social class because it's voluntary. He has joined it. And under Hernández Montiel, it's... It cannot... In his particular situation, what he's done cannot be changed, nor should he be required to change his membership in... But wouldn't that be true of every profession? Let's take lawyers or judges in some of these countries in Latin America where you have dubious situations between the judiciary or the legal system and, say, some of the drug dealers. Would they be a social class if they stepped out and took positions? Well, they could be. I don't necessarily see the judiciary in a Latin American country as not being part of a social class. And they could very well be. So would... I mean, under this definition, literally any... Basically, any profession then becomes a social class. Well, it's not per se any profession. In this particular situation, he has someone who's put material into the public domain. It's immutable. It can't be changed. And... But isn't... Isn't the real problem here? This... That... It isn't that he's a journalist. It's what he wrote as a journalist. In other words, is there anything in the record to suggest that the satanic cults were after journalists in general or even high-profile journalists in general? I'm not aware of a specific reference to journalists in general, although there is in the country reports the list of journalists who've been killed, and there are a number without cause. But they tend to be because of something particular they wrote. So I guess what I'm saying is it's much more comfortable to me to look at this case as turning, if at all, on... Was the application also based in part on religion? Yes, it's based on religion. Why isn't that closer into what was really happening here? The real problem is that this person was opposing... The satanic cults, as I understand it, were religious in the sense that we use the word religious, and he didn't... Both in his church work and as a journalist, was hampering and, in a sense, proselytizing against this religion. Isn't that what the real problem was here? Is that why? I believe that's a part of it. There is a religious component to it, and there's no parallel in Ochoa to that. What then is the link that it was because of religion as opposed to simply exposure of conduct that was the reason that you claim... He's a lay worker in the church, and there is documentary evidence about his participation in the church program dealing with youth who had been in the satanic cults, and he has worked with 300 or so youth. So there's... As a lay church worker, he has been subjected to the threats and harassment and persecution. Well, see, the one question I have about that is the temporal aspect because he's in the church, and then it's really when the documentary is produced, does he get any threats, which is 1998. So he's been being in the church, and he's not being attacked simply because he's doing this church work. Well, let's look at it from this point of view. The priests were threatened much earlier. When he makes the documentary film, I think that combines with his church work to bring him into a very high profile. He's now known as a lay church worker who's in clear opposition to the satanic cults. Yeah, I'm just having some trouble. Here's the... In an abstract sense, it seems that people who what we would consider to be First Amendment rights and then are persecuted, that there ought to be some way that they would get asylum just as an abstract. But the way the law is written, you have to fit in one of these boxes. And so anytime somebody exposes something that somebody else is doing or doesn't like, how do you draw the line between basically being an investigative journalist and exposing what one might consider unfortunate and bad things, and then just saying, well, because the subject of that is either religion or politics. Ergo, it's political or religious imputation. Well, if we look at the political aspect of this case, and specifically at pages 267 and 309 in the record, there is documentation of the extent to which he worked with government prosecutors and government agents. I think that establishes a political motive. It's not simply that he made a film attacking the satanic cults. He had extensive contact with Colombian government officials, which established a political viewpoint, at least in the eyes of the persecutor. So I think it's clear that there's an imputed political... Well, is there any evidence of that? I mean, I guess that is a theory that could be supported by the law if there's corollary evidence. Well, he's found credible. That's his testimony and his statement. What was his testimony and statement? That he had interviewed government officials and DAS agents, which I understand is the equivalent of the Colombian FBI, and prosecutors about the problem of these satanic cults. But that's a far cry from saying, and it was because of my political involvement, my interviewing of these politicians, I became intertwined with them, and therefore that's why I've been persecuted. Well, it's not just interviewing them. He's using the interviews to show what a problem the satanic cults are. Okay. You might want to save your remaining time. And... Okay, I love it. Thank you. The court... Oh, I got a frog in my throat. The court, please. I'm Marshall Tamor Golding from the Office of Immigration Litigation, representing respondents. And could you maybe put the microphone up a little closer and speak a little louder? Generally, people complain that I speak too loud. Well, we won't complain. Okay. I will touch briefly on the asylum and withholding aspects of this case, because I think that asks us to talk about Ochoa from the cat point of view. But Ochoa, I think, fully answers the asylum, plus the arguments, of course, that we made in our brief. But why, as I said, I don't see the journalist's claim very much, but I'm much less clear on whether the IJ opinion adequately deals with the religion aspect of this case. The IJ opinion says basically that the respondent... First of all, do you agree that the satanic cult is a religion under our precedence and that religious beliefs opposed to the satanic cults and proselytizing against it would qualify as a religion? At least the satanic cults are at least similar to a religion. I don't know if they'd be recognized as a religion in this country. But for the sake of this argument, I will agree with it. And if the reason why Mr. Quintero was being threatened and harmed was that he was trying to persuade people to not believe what the satanic cults believed because he didn't believe it or because they thought he didn't believe it, imputed religion, would that be a ground for a protected class under the statute? Considering what the, at least the record shows, what he claims the satanic cults were doing, I do not think so any more than a journalist in this country who wrote articles exposing... That's a different question. I mean, I'm trying to go step by step. We don't know whether it was because of his journalism, because of his... Let's suppose he wasn't a journalist. Let's take that out. Let's say he wasn't a journalist. He was a church activist going around persuading young people to either not join satanic cults or to get out of the satanic cults. Would that... And he was... Let's just suppose for now that that's the reason he was threatened. Would that come within the statute? I'm trying to explain why that would not. And I'm drawing a parallel to... I forget what they are called, but they're the extreme Mormons, the one that the Mormon church has disowned. The fundamentalist Mormons. The fundamentalists who still practice bigamy. Or another example might be the Penitentes, who at Easter time will literally crucify some of their members. And both of these things are against the law. And if somebody, regardless of whether he is a journalist or simply a mainline Mormon, says, no, you people should not be doing this because this is against the law. I don't think that that is... What if he said you should not be doing it because it's against religion, it's against God? Well, he didn't say that, I don't think, in this case. What I'm saying is that if the cult is engaging in illegal activities, then persuading people that they are doing so and something should be done about them is not religious, using that language. What if Salman Rushdie, who is this author who has been vilified in the Muslim world, and he has written various books, what if he goes back to Iran and they begin to threaten him and send letters and send bullies to his house? Would that be on account of religion? Matter of fact, the fatwa which was issued against him, we're talking about Salman Rushdie, I believe. Yes, that is because he was attacking the... From the orthodox Muslim point of view, he was attacking the religion itself. But there's a difference between attacking a religion for its beliefs and attacking it for its practices. And what is there in this record, because I was not aware of that, that suggests that, again, leaving the journalist part out of it, that the activism that this gentleman was involved in to persuade people not to participate in the cults was dealt with illegal acts as opposed to whatever it was they were doing. Well, he was opposing them for what they were doing, and what they were doing was illegal. And it was illegal because it was a religion outside or because the specific acts? I believe it's because of the specific acts. The very fact, for example, that he interviews this one person, and by his testimony, this person was killed and his body was cut up, indicates that these are people who engaged in basically... In fact, that is the whole... And I'm not sure I know the record well enough, but when he was dissuading people, young people, from participating in these cults, was he dissuading them because the cults were doing illegal things or because they were satanic cults and you ought not to be worshipping Satan? I'm trying to think of what the answer would be. I think the... I don't have any evidence that suggests that the core problem here... I mean, they ended up killing people, but I thought that the concerns of the priests and of people within the church about these cults was that they were worshipping the devil, essentially. Well, I think the answer is, though, that whereas he didn't say to the young people, don't do this because you're doing something illegal. He is saying, don't do this because it is wrong, but the thing that made it wrong was what made it illegal. So in other words, it still would be comparable, I believe, to a orthodox Mormon in this country saying to a mainline Mormon in this country, saying to those who might be tempted to join these obscure Mormon sects, he might say, don't do this because it's wrong. And what makes it wrong is that it's illegal. Well, but it's really, that's a good example of something being wrong for two reasons, potentially. One, it's against the law now to engage in some of these practices such as bigamy, but also the more traditional Mormon church feels that apart from legality, it doesn't fit within their construct of the religion. So it's kind of, it's both religiously wrong and it's state-wise legally wrong. So what do you do when it's wrong on two counts? Well, I think the answer here might, let me see if I can formulate this right. That's not everything that, let me back off and try to rephrase it. That if I am opposing, even if it's a religion, I'm opposing it because I think it's wrong. That does not make, nevertheless, when the people of that religion react against me, they are not reacting, they are reacting against me because I have attacked them. And I think that that is not persecution because of my religious beliefs. It's persecution because I am attacking their religious beliefs. This reminds me of like reverse passing off in intellectual property. It's like, that's kind of what the argument is, though, is that it's not, they're not after me because of my beliefs. They're after me because I'm attacking their beliefs. Well, yes. Which is, I mean, it can't be religious persecution. That's correct. Yes, I would. Was that your understanding of what the IJ held? I mean, what's the legal question here? Well, let me take a look here because I have the IJ decision, if I can find it. He said he's not established the satanic cult members were motivated to harm him due to his religion. He indicated that he had done volunteer work with the Catholic Church, but he began to receive threats as a result of the documentary. So he didn't establish that his particular religion was a motivating factor, which I take to mean Catholicism. Is that what he meant? I'm sorry. Well, I find that the one thing I can't find, I have so much stuff here. I read almost all of it, so. Well, I would be able to focus better if I could read it, Your Honor. The one thing I don't want to do is lose time to, because I think you're interested in the cat question. Well, we've got the briefing on that, and you're almost out of time. You have nine seconds left, so. Well, but there was no briefing on the cat in regard to Ochoa. Unless, I understood that when you sent your order, you prepared to comment on Ochoa, that it was the cat part of Ochoa. Not necessarily. You may have read that into it, but. Oh, well, I will quickly say this. That one, on the cat argument, particularly the Ochoa, and it goes back to the, of course, to Zeng. On that argument, he failed to raise it in his brief to the board. In his brief to the board, he argued that he fit in all the different categories for asylum, but he made no argument that the torture that he claimed was, was with the, he made no acquiescence arguments. So, therefore, that was waived. Okay. We have your point in mind. Thank you. You have some time left for rebuttal. Not much, but a half minute, so. Okay. The first point I want to make is I want to direct the court's attention to page 257 in the record, which corroborates the petitioner's involvement with the Catholic Church. And I do want to state that there is a battle between the Catholic Church and the satanic cults. And in calls to the respondent, they might work to people, the respondent is, the petitioners worked with, they've said that they're worshipers of the devil. So I didn't want to make that point. As far as the torture convention claim goes, at the time the IJ's decision was issued, there was no Zhang versus Ashcroft and there was no Ochoa. And I don't believe that he could have briefed that issue at the time. I believe that would need to be remanded. And I believe it has to be remanded. The current standard is different than the standard the IJ applied. Thank you. So, thank you. Thank both counsel for your arguments this morning. The case of Quintana versus Gonzalez is submitted.
judges: McKeown, Berzon, King